429 So.2d 79 (1983)
FLORIDA POWER & LIGHT COMPANY, Appellant,
v.
Anna Jane BERMAN, et al., Appellees.
No. 82-1088.
District Court of Appeal of Florida, Fourth District.
April 6, 1983.
Arthur J. England, Jr., of Steel, Hector & Davis, Miami, for appellant.
James T. Walker of Brennan, McAliley, Hayskar, McAliley & Jefferson, P.A., Fort Pierce, for appellees.
GLICKSTEIN, Judge.
This is an appeal from an order denying a petition for order of taking. We affirm.
The trial judge, having heard all of the testimony, expressed lengthy findings of fact in the transcript and issued an order which recited the following conclusion:
That the taking of the particular perpetual easement proposed and resolved by the condemning authority is not necessary for the public good. When the relevant environmental factors, the protection of natural resources, the possible alternative routes, the relative costs of the various alternative routes and the proposed route, the long range planning, and safety factors are all considered, this court concludes that the condemning authority abused its discretion in selecting the route sought to be condemned. If the route sought to be condemned is in fact condemned and the easements taken as proposed, then the unique and invaluable environmental and aesthetic qualities of Old Sherman Road will be significantly impaired and very probably actually destroyed and lost forever.
His express findings of fact, all supported in the record, included the following:
In 1979 Florida Power & Light Company proposed a 69 KV electric power transmission line from the Okeechobee Substation to the Sherman Substation; these substations both in Okeechobee County, Florida. This transmission line is a second line connecting these two substations. One line already exists.

*80 The initial analysis and preliminary plan for this line was done on a cost per mile for the design, and the placement of the facilities included six possible routes;
Route possibility A, which is approximately four miles; possibility B, which is approximately three miles; possibility C, which ranges from two-point-nine miles to three-point-zero-one mile; possibility D, which estimates range from three-point-zero miles to three-point-one miles; alternative or possibility E, three-point-two miles; and alternative or possibility F, four-point-one miles.
At that time further analysis of the six alternatives was undertaken by the Florida Power & Light Company project manager for general engineering; and he included in his analysis the economic factors of the various alternatives, future long term planning, safety, and the environmental impact of the six alternatives.
Included in his plans for the lines were that the lines would be constructed using concrete poles which are twenty-four inches in diameter at the base and which rise sixty-two feet above the ground, and which weigh approximately twenty tons each pole.
They would be set approximately two hundred feet apart and require either a fifteen-foot perpetual easement along an existing road right-of-way, or a fifty-foot right-of-way for the placement and the maintenance of the poles and the other facilities that go along with the transmission line.
The minimum of a fifteen-foot perpetual easement is needed to deal with what is known as line blow-out, the term blow-out.
... .
Alternative C is estimated by Florida Power & Light at a cost of five hundred and fifty thousand dollars, and this includes a fifteen-foot easement.
And, as an aside, this is the alternative which has been sought to be condemned by the Florida Power & Light Company.
Along this alternative we find what has been characterized as Old Sherman Road, which is really the area that the bulk of the testimony is centered around.
Along Old Sherman Road, approximately one hundred trees will be removed, others trimmed, to accommodate the transmission lines. They must be trimmed to below eighteen feet to accommodate the transmission lines which, generally, are twenty-one to twenty-two feet above the ground, the lowest transmission line.
The roadbed of Old Sherman Road is deteriorated. It is traffickable. There are three-foot ditches on both sides of the road. The road is not maintained currently by the county, although, apparently, it is an open county road. The transmission line would go along the north side of this road.
On both sides of the road and in the subject area there are approximately five hundred trees; eight families, and six children live along this road.
The area of Sherman Road runs through three unique plant zones; the dry zone, the transition zone, and the wet zone. There are many plants found in this area adjacent to the road. There are, as I have mentioned, some five hundred trees along the roadside, on both the north and south sides of the road.
It is characterized as a unique ecological niche. It is the only road in the Okeechobee area with a canopy of trees over the top of the road; and it is the only area in the Okeechobee area with this composite variety of zones and plants.
If the transmission lines go along Old Sherman Road, there will be a substantial destruction of this unique ecological niche because of the removal of trees and the intrusion of sunlight, which will allow many weeds to grow which do not grow in that area at this time. It will then cause a change in the ecological character of the road area.
The character of the area, the trees, are very valuable to at least three of the families that live along this road.

*81 Alternative D is estimated to cost seven hundred thousand dollars by Florida Power & Light. It does include an actual road right-of-way of fifty feet. It covers an area of relatively few trees. In the area, not in common with the other alternatives, only one residential unit exists.
... .
The types of trees in each route which may be removed or cut has not been considered by Florida Power & Light in determining the route, nor has the number of trees to be cut or trimmed been considered, since the project engineer has stated that he did not know the number of trees which would be cut or removed in order to place the line in any of the particular alternatives.
The twenty-ton poles that I have made reference to are carried on a flatbed trailer. They are set in the ground into an augured hole by a crane capable of doing that.
Some trimming or tree removal may be necessary to set the poles, themselves, in addition to any trimming or tree removal which would be necessary to accommodate the lines.
... .
The one hundred thirty-eight KV line would cause static electricity, that is, induced electricity, in homes and cars which were immediately below or quite close to the line itself.
The initial transmission, which will be the 69 KV transmission, will cause an audible hum under certain weather conditions which can be heard by persons underneath the line.
We note an additional fact not mentioned by the trial judge; namely, that the utility's project manager, who was its sole witness upon the issue of route selection, testified that he would have considered it significant had he known of an offer of donation of property along an alternative route. He apparently was unaware of such offer having been made to the utility by one of the property owners. Another owner testified as to her similar willingness to donate property for an alternative route.
Appellant contends the trial court erred in concluding that "the condemning authority abused its discretion in selecting the route sought to be condemned." It bases its argument upon the premise that the trial judge misapplied the correct legal standard, claiming that it was incumbent upon him to affirm the route selection in the absence of gross abuse of discretion. However, although the late Justice Terrell, in Inland Waterway Development Co. v. City of Jacksonville, 38 So.2d 676, 678 (Fla. 1948), a case involving the pure issue of necessity, not route selection, referred to the absence of an answer which alleged fraud, bad faith or gross abuse of discretion, he also said:
From these cases it follows that a broad discretion is vested in those clothed with power to determine what property and how much is necessary to condemn for public purposes and the application will not be denied unless a clear abuse of discretion is shown.[1]
*82 In the root case of Wilton v. St. Johns County, 98 Fla. 26, 123 So. 527, 533 (1929), the phrase "abuse of discretion" appears without the adjective "gross." Moreover, why could it not be gross abuse of discretion or capricious to select a route that required paying for land and rejecting a route over land someone was willing to give?
In 1968 the people of Florida adopted as part of their constitution Art. II, § 7, which provides, in part:
It shall be the policy of the state to conserve and protect its natural resources and scenic beauty.
Thereafter, the Second District Court of Appeal, in Florida Power Corp. v. Gulf Ridge Council, 385 So.2d 1155, 1156 (Fla. 2d DCA 1980), approved the following reasoning of the trial court in its order dismissing the utility's petition for condemnation:
Once a condemning authority has decided that a taking is necessary, selects one of the alternatives available to it, and applies to a court for approval of the taking, the court's role is then to assure that the condemnor acted in good faith, did not exceed its authority, and did not abuse its discretion. Hillsborough County v. Sapp, 280 So.2d 443 (Fla. 1973). Florida law requires a condemning authority to weigh and consider several factors in deciding which route to select and which land to condemn. Specifically, Florida appellate courts have enumerated five criteria that a condemnor must weigh in order to properly exercise its discretion; [sic] (1) Availability of an alternate route; (2) costs; (3) environmental factors; (4) long-range area planning; and (5) safety considerations. The failure or refusal of a condemning authority to properly weigh these factors may constitute an abuse of discretion.
Admittedly, a condemning authority does not necessarily abuse its discretion by choosing one route over another equally suitable route. However, a condemnor does abuse its discretion by making a route selection determination without first properly considering and weighing the relevent [sic] factors considered determinative by Florida appellate courts.
The words of the late Judge Spector, when concurring in Chipola Nurseries, Inc. v. Division of Administration, Department of Transportation, 294 So.2d 357, 361 (Fla. 1st DCA 1974), are as timely today as when written:
Our own experience with the route selected for this same interstate highway in Leon County, with its consequent waste *83 of hundreds of acres better suited for natural homesites than for concrete highways, is convincing evidence that an engineer's transit has no social conscience. The ecological carnage visited upon Lake Jackson by the choice of the northern route while to the south of Tallahassee lay thousands of acres hardly suitable for growing scrub oak is yet a further reason for judicial concern. Indeed, applying the criteria by which we determine abuse of discretion which are specified with approval in the Supreme Court's Sapp decision  cost, environmental factors, long-range planning, as well as the availability of an alternative route  it may well be that routing Interstate 10 to the north of Tallahassee rather than to the south constituted an abuse of discretion for which redress could have been had in the courts had our concern for the environment not lain dormant so long.

(Emphasis supplied.)
In this case, the record is silent as to any training or experience of the utility's project manager in ecology or environmental planning; yet the utility's review of the ecological factor seems to have been his visit to Old Sherman Road. If there was any real ecological consideration given by the utility, it does not appear in the appendix furnished by appellant to this court. In contrast, the property owners provided detailed evidence of the niche's ecological uniqueness and of the destruction thereof which the disputed route would effect. Accordingly, there is record support for the conclusion that in its selection of a route, the utility clearly abused its discretion. Appellant's final contention that the trial judge substituted its judgment for that of the utility is without merit.
LETTS, C.J., and WALDEN, J., concur.
NOTES
[1] This latter expression should be given meaning in this route selection case. Otherwise, the matter becomes an exercise in semantics for the appellate court. For example, it could be argued that when used as a verb, as the trial judge did here, the word "abuse" has appeared without the adverb "grossly" in at least one decision of the supreme court and of a district court of appeal respectively. See Hillsborough County v. Sapp, 280 So.2d 443, 445 (Fla. 1973), in which the court said:

Once a condemning authority decides that a taking is necessary, selects one of the alternatives open to it, and applies to a court for approval of the taking, the role of the court is limited to assuring that the condemnor acted in good faith, did not exceed its authority, and did not abuse its discretion.
See also Catholic Burse Endowment Fund, Inc. v. State Road Department, 180 So.2d 513, 516 (Fla. 2d DCA 1965), cert. denied, 188 So.2d 814 (Fla. 1966):
Unless a condemning authority acts illegally, in bad faith, or abuses its discretion, its selection of land for condemnation will not be overruled by a court.
City of Jacksonville v. Griffin, 346 So.2d 988, 990 (Fla. 1977), was a case involving necessity per se, not route selection. The court used two phrases; namely, "gross abuse of discretion" and "abuse of discretion." This court used the phrase "gross abuse of discretion" when necessity, not route selection, was involved in Florida East Coast Railway Company v. Broward County, 421 So.2d 681 (Fla. 4th DCA 1982). Canal Authority v. Litzel, 243 So.2d 135 (Fla. 1970), also a necessity case, used the phrase "gross abuse of discretion."
We are aware that Sibley v. Volusia County, 147 Fla. 256, 2 So.2d 578, 582 (1941), contains a concurring opinion in which three other justices concurred which said:
Where the legislature delegates the powers of eminent domain to an administrative agency of government, or to a quasi public corporation, it may also delegate the power to determine the necessity for making the particular improvement for such public purpose, and generally such determination will not be disturbed by the courts in the absence of fraud or gross abuse of discretion. The rule usually applies also to the route or location of the proposed improvement.
However, we also note that Isleworth Grove Co. v. Orange County, 79 Fla. 208, 84 So. 83, 84 (1920), said:
If a plain case of the abuse of the right of eminent domain by county commissioners is shown, the law affords a remedy in due course at the instance of proper parties.
Spafford v. Brevard County, 92 Fla. 617, 110 So. 451, 458 (1926), added:
While the grantee of the power of eminent domain is allowed a reasonable discretion in determining the necessity and extent of the appropriation, whether any necessity whatever actually exists, is in the ultimate a judicial question. St. Louis, etc., R. Co. v. Southwestern Telephone & Telegraph Co., 121 F. 276, 58 C.C.A. 198; 20 C.J. 630, and cases cited. The grantee of such power may determine the location of the land required to be appropriated in order to accomplish the public purpose in view, and such determination will not be interfered with by the courts if it is made in good faith and is not capricious or wantonly injurious or in some respect beyond the privilege covered by the statute. See numerous authorities cited on pages 632 to 634, vol. 20, C.J.