MCDONALD, J.:
**170 In 2015, Oien Family Investments, LLC (OFI) brought this action against Piedmont Municipal Power Agency (Piedmont), **171 seeking to permanently enjoin Piedmont from condemning a portion of its 116-acre property in Newberry County (the Property). In the alternative, OFI sought an order directing Piedmont to reroute its proposed power transmission line along the southern border of the Property. The circuit court denied OFI's request for injunctive relief, granted Piedmont's motion for a directed verdict, and denied the parties' respective requests for attorney's fees and costs. OFI argues the circuit court erred by (1) failing to properly apply *649 Southern Development v. South Carolina Public Service Authority[1] and (2) failing to find Piedmont violated the applicable industry standard in selecting the route for its high voltage transmission line. Finally, OFI challenges certain circuit court findings as erroneous or internally inconsistent. We affirm in part and vacate in part.
Facts and Procedural History
In December 2005, Lynn and June Oien (collectively, the Oiens) purchased the Property for $400,000.[2] The Oiens made substantial improvements to the Property, such as grading a road, running underground power, and constructing a 7,000 square foot shop to house track hoes, tractors, mowers, and other equipment. The Oiens invested $160,000 in the shop, which included a well and septic tank. They also prepared to build their retirement home by clearing timber and grading the land. By the time of the nonjury trial, the Oiens had invested approximately $370,000 in the Property.
Piedmont is a joint agency formed by ten upstate municipal electric utilities to purchase wholesale electrical power from Duke Energy. The City of Newberry (City) owns and operates its own electrical distribution system (EDS); it receives service from three Duke Energy "power deliveries." The City's EDS demand peaked in 2012. At this time, Kraft Foods, Piedmont's largest customer and one of the City's largest employers, informed the City that it intended to enlarge its plant and would therefore require additional power. Thereafter, the City **172 sought to install a new substation to increase electrical output and reliability for its customers, including Kraft Foods.[3] The City subsequently partnered with Piedmont to secure the right-of-way for the transmission line needed to energize the new substation.
On February 28, 2013, Piedmont's consulting engineer, Alan Cobb, issued a report (the Report) to Piedmont's transmission committee recommending a route for the transmission line. The proposed route was to run over two miles through the property of fifteen landowners-including the Oiens-and include poles approximately ninety feet tall. The Report, based in part on Google Earth and Newberry County geographic information system (GIS) maps, considered several factors including: environmental impact, land use, impact to individual landowners, costs for the route, and visual impact. The transmission committee approved the project, including the proposed route, on March 5, 2013. The Piedmont board of directors subsequently voted to build the new transmission line from a nearby Duke Energy line to a new substation near Kraft Foods.
The Oiens first learned about the project in a February 2013 email from a neighbor, Misty West. West informed the Oiens of the City's plan to construct "a new 100 KW transmission line from the service line near your house to the Kraft plant." West attached a drawing of a proposed route for the transmission line along the southern boundary of the Property and noted she told the City "there is no way [the Oiens] would willingly give [you] an easement to cut [their] property in half." She also told the Oiens someone from the City would contact them regarding the project. After this point, the parties disagree as to the pertinent facts.
Todd Guy, an electric foreman for the City, testified that he first contacted the Oiens regarding the right-of-way "somewhere around" February 2013. Guy presented the Oiens with the selected route for the transmission line, which went through the middle of the Property (the Middle Route). At the Oiens' request, Guy then presented alternative routes along the Property's southern boundary (the Southern Route) and northern boundary (the Northern Route). He testified the **173 Oiens rejected both potential alternative routes and asked him to again explore the *650 Middle Route.[4] Guy's last contact with the Oiens was through their forester and appraiser, Paul Major, whom the Oiens had engaged to communicate with the City and Piedmont.
By contrast, Mr. Oien claimed neither the City nor Piedmont reached out to the Oiens. He testified his first contact with the City was in June 2013, when he found a Duke Energy employee on his Property and called Todd Guy. Mr. Oien claimed he never saw any proposed routes, other than the route reflected in West's email attachment, until he met with City representatives in September 2013. Further, Mr. Oien maintains he never rejected the Southern Route. In late September, City representatives met with the Oiens and Major, and the Oiens expressed their preference for the Southern Route.
On November 26, 2013, representatives from Piedmont and the City met with the Oiens and Major. The Oiens brought their house plans to show Piedmont why the Middle Route was problematic and believed they made clear their desire for the Southern Route. Still, Piedmont indicated it planned to use the Middle Route. Major, on behalf of the Oiens, requested a timber count and values as well as a pole count with proposed pole locations. According to Regier, "the interactions with the Oiens were pretty pleasant. The interactions with Mr. Major were pretty adversarial." Piedmont explained it would need to survey the Middle Route in order to provide the requested information, and Mr. Oien eventually consented to the survey.
Mike Frazier, Piedmont's Director of Engineering and Power Supply, testified the Oiens agreed to the Middle Route following the November 26, 2013 meeting. Although the Oiens dispute any contention that an agreement was reached at this meeting (or ever), Mr. Oien left the following voicemail for Frazier:
Michael, it's Lynn Oien. We met with you the other day in regard to the power line. We walked it. We made the decision we want to stay with what you have right now that **174 you've originally drawn up as opposed to changing it, so move forward and get final surveying done.
In early 2014, Piedmont provided the Oiens with the survey results and proposal illustrating the Middle Route. At a March 2014 meeting with the City, the Oiens indicated they would not accept the City's offer and again expressed their desire for the Southern Route. By this point, the City had spent $3,600,000 on the new substation and was waiting to have it energized by the new transmission line.
On August 14, 2014, the Oiens received a right-of-way agreement from Piedmont describing the Middle Route (the Agreement). Piedmont requested that the Oiens either sign the Agreement or otherwise provide a response by August 22. The Oiens rejected the Agreement. On September 29, 2014, the Oiens and their attorney met with representatives from the City to again discuss the route for the proposed transmission line.
On February 9, 2015, Piedmont served OFI with a notice of condemnation and tender of payment for the "right-of-way and easement to be taken" for constructing the transmission line. OFI then filed an action challenging the condemnation and seeking injunctive relief, attorney's fees, and litigation costs. Piedmont answered and counterclaimed, seeking reasonable costs and litigation expenses.
Following a nonjury trial, the circuit court directed a verdict in favor of Piedmont. After OFI moved for reconsideration and to alter or amend, the circuit court amended its order, specifying that the Middle Route was the most feasible route for the transmission line. The circuit court denied OFI's subsequent motion to alter or amend.
OFI appealed and sought entry of a statutory automatic stay, injunction, and supersedeas. That same day, this court granted the statutory stay. Piedmont filed a motion to lift the stay or require the posting of bond. Following oral argument on the motion to lift *651 the stay and the consideration of additional briefing, we lifted the stay.[5] **175 Standard of Review
"An order granting or denying an injunction is reviewed for [an] abuse of discretion." Lambries v. Saluda Cty. Council , 409 S.C. 1, 7, 760 S.E.2d 785, 788 (2014) (quoting Strategic Res. Co. v. BCS Life Ins. Co. , 367 S.C. 540, 544, 627 S.E.2d 687, 689 (2006) ). "An abuse of discretion occurs when the trial court's decision is based upon an error of law or upon factual findings that are without evidentiary support." Id. (emphasis in original) (quoting Fields v. J. Haynes Waters Builders, Inc. , 376 S.C. 545, 555, 658 S.E.2d 80, 85-86 (2008) ).
Southern I , upon which OFI heavily relies, provides a further review framework, explaining:
Southern's action is based upon [ section 28-2-470 of the South Carolina Code (1991) ] .... [, which] provides that a condemnee's action challenging the condemnor's right to condemn must be brought in a separate proceeding from the condemnation action. Under prior [case law], such a proceeding was in equity in the court of common pleas. Since this is an equitable action for an injunction this court may review the findings of fact of the [circuit court] based upon our own view of the preponderance of the evidence.
305 S.C. at 509, 409 S.E.2d at 429 (citation omitted); see also Lambries , 409 S.C. at 8, 760 S.E.2d at 788 ("We find that, while an injunction is equitable and subject to the trial court's discretion, [when] the decision turns on statutory interpretation ... this presents a question of law. As a result, this Court need not give deference to the trial court's interpretation."). However, unlike the analyses in Southern I and Lambries , the circuit court's decision in this case did not turn on statutory interpretation. Additionally, OFI conceded at oral argument that "abuse of discretion" is the appropriate standard of review. Thus, while we review the circuit court's order denying injunctive relief for an abuse of discretion, we must keep in mind the caution that our courts "will not interfere with the exercise of the condemnation power unless the condemning authority has acted in bad faith, fraudulently, or with a clear abuse of discretion." Southern I , 305 S.C. at 515, 409 S.E.2d at 433.
**176 Law and Analysis
I. Injunctive Relief
Relying on Southern I and Southern II , OFI argues the circuit court erred in denying injunctive relief because Piedmont abused its discretion when it selected the Middle Route over the Southern Route. OFI asserts Piedmont lacked a rational basis to support its selection of the Middle Route because it failed to conduct an adequate alternate route analysis or properly compare land acquisition and engineering costs for the Middle and Southern Routes. We disagree.
In Southern I , a land development company (Southern) challenged Santee Cooper's condemnation of a portion of its property-which Southern planned to develop as a high-end golf course and residential community-for the construction of a high-voltage transmission line. 305 S.C. at 508-10, 409 S.E.2d at 429-30. The master-in-equity granted injunctive relief, finding Santee Cooper (1) "was estopped from using the proposed route based upon certain representations of its officers which were relied upon by Southern to its detriment" and (2) "clearly abused its discretion in selecting the transmission line route because it did not consider or improperly considered certain criteria." Id. at 509, 513, 409 S.E.2d at 429, 431 ; see also Florida Power & Light Co. v. Berman , 429 So.2d 79, 80-82 (Fla. Dist. Ct. App. 1983) (holding the condemning authority abused its discretion by selecting a route without weighing and considering all of the required criteria-availability of an alternate route; cost; environmental factors; long-range planning; and safety considerations-because the selected route would cause "substantial destruction of this unique ecological niche because of the *652 removal of trees and the intrusion of sunlight").
Relying on Berman , the master determined the total cost for the route chosen by Santee Cooper was $5,762,000, whereas the costs for the two alternate routes Southern proposed were $1,284,000 and $1,315,000. Id. at 514, 409 S.E.2d at 432. Further, the master found there was "no material difference in the reliability of the three routes although he considered the two alternate routes somewhat safer due to their distance from a nearby airstrip and also more aesthetically pleasing." Id.
**177 The court of appeals reversed the master's equitable estoppel holding. Id. at 512, 409 S.E.2d at 431. In reviewing the master's "abuse of discretion" finding, this court noted, "[t]he parties have not cited any reported South Carolina case in which a planned condemnation was permanently enjoined by a court because the court found the condemning authority abused its discretion in the selection of a chosen route." Id. at 514, 409 S.E.2d at 432. "The legal principle enunciated in the South Carolina case law is that a court of equity will not interfere with the exercise of the condemnation power unless the condemning authority has acted in bad faith, fraudulently, or with a clear abuse of discretion." Id. at 515, 409 S.E.2d at 433. The court observed our jurisprudence has "not outlined what constitutes a clear abuse of discretion in the condemnation context." Id.
Ultimately, this court determined Santee Cooper had established legitimate criteria-safety, reliability, aesthetics, and cost-for a rational decision making process and a valid exercise of discretion. Id. at 516, 409 S.E.2d at 433. However, because Santee Cooper "assumed all land in a general area was worth the same" and "their cost estimates presented to the board of directors did not include land acquisition costs," the court found Santee Cooper's "failure to legitimately consider land acquisition costs indicate[d] [its] choice of a route lack[ed] a factual basis." Id.
Vacating the master's abuse of discretion analysis, the court of appeals remanded "with instructions that the master direct Santee Cooper to re-evaluate its proposed route and the alternate routes proposed by Southern." Id. at 516, 409 S.E.2d at 434. The court explained, "Santee Cooper should consider its criteria of safety, reliability, aesthetics, and costs," including land acquisition costs, "along with any other appropriate factors such as environmental conditions and long range area planning by public authorities. ... Santee Cooper should then exercise its discretion in the choice of a route based upon a reasoned analysis of the relevant factors." Id. The court clarified, "By this opinion we do not imply that any route previously considered is eliminated from the consideration process or that any new route cannot be considered. We simply hold that a condemning authority must exercise its **178 discretion by a rational decision making process [that] is supported by facts." Id. at 516-17, 409 S.E.2d at 434.
Our supreme court reversed the court of appeals' equitable estoppel holding. Southern II, 311 S.C. at 34, 426 S.E.2d at 751. Focusing on the master's finding as to representations made to Southern by high-level Santee Cooper executives, the supreme court affirmed the master's order enjoining Santee Cooper from proceeding with the condemnation. Id. at 33-34, 426 S.E.2d at 750-51. Although the supreme court agreed with this court's abuse of discretion analysis, the court found "the remand as ordered by the Court of Appeals unnecessary" due to its holding on the estoppel question. Id. at 34, 426 S.E.2d at 751. As the supreme court found the estoppel question dispositive and did not analyze the abuse of discretion question in Southern II , we consider the abuse of discretion framework provided by this court in Southern I .
In the current case, the record reflects that Piedmont's consulting engineer, Alan Cobb, issued the Report to the transmission committee recommending the Middle Route for the transmission line. Cobb's Report was based on Google Earth and Newberry County GIS maps and considered the following factors: environmental impact, land use, impact to individual landowners, costs for the route, and visual impact. Cobb estimated land acquisition costs at $100,000 based on a land value of $5,000 per acre. He testified he neither visited the Property nor met with the Oiens, nor any other affected landowners, *653 prior to issuing the Report. Cobb had no notes regarding the factors he considered and did not issue additional reports.
After the transmission committee and the Piedmont Board of Directors approved the Middle Route, the Oiens and the City were in contact at some point between February and June 2013. Mr. Oien indicated his preference for the Southern Route and requested several changes, which led Cobb to walk the Southern Route. However, based on Duke Energy's preference for Piedmont's tap to be "as close to mid-span as possible" as well as the number of turns that would be required, additional poles and costs, environmental impact to the Oiens' pond, and potential issues with the United States Corps of Engineers, Cobb concluded the Southern Route was **179 not feasible. He estimated the additional poles and installation for the Southern Route would cost $200,000. Cobb explained he did not conduct a full analysis of the wetlands after estimating the additional cost for the Southern Route because he was then informed that the Oiens did not want the Southern Route.
Cobb testified he next completed the engineering for the Northern Route. He estimated the additional costs for the Northern Route would be less than $100,000. However, Cobb was informed to stop working on the Northern Route because the Oiens had rejected it.
Piedmont's Director of Engineering, Mike Frazier, testified he did not complete an alternate route analysis. He acknowledged Piedmont did not physically inspect the properties along the Middle Route before approving the line in March 2013. He estimated the two turns required by the Southern Route would cost an additional $30,000 to $40,000. However, Frazier admitted Piedmont never considered the total cost of the Southern Route. Likewise, he never saw anything in writing confirming there was anything unsuitable about the Southern Route. Further, he never saw anything in writing from Cobb regarding increased costs, if any, for the Southern Route "because no final engineering [was] done on the [S]outhern [R]oute."
David Graydon, an expert in the field of real estate appraisal, estimated the land acquisition cost for the Middle Route was $21,075 and valued the Property at $5,000 per acre. He opined that implementation of the Middle Route would not exclude the Property from use as high-end residential real estate, and the Middle Route would not create any damages to the remainder.[6] He stated, "unless a house is within 300 feet or less [of] a transmission line, that it ... does not have any loss in value."
**180 OFI's appraiser and forester, Major, testified the Oiens paid $3,500 to $3,700 per acre for the Property in 2005, which was top dollar at that time. Major explained the highest and best use of the Property is as a high-end rural residential estate, and the value of the Property at the time of trial was $603,000 (approximately $5,200 per acre). Major estimated the land acquisition cost for the Middle Route was $20,500.
Due to its proximity to the home site, Major opined the Middle Route would decrease the value of the remaining acreage by ten to fifty percent.[7] He testified that a fifteen percent damage would create remainder damages of $87,000, and twenty percent would create damages of $116,000. Major further opined the Southern Route would not create any damage to the remainder because the line would not be visible from the Oiens' home site.
Bill Rogers testified as OFI's expert in right-of-way acquisitions. Rogers explained that in early 2016, he retired from Central Electric Power Cooperative (CEPC), where he served as manager of right-of-way services.
*654 Following the supreme court's decision in Southern II , CEPC and other utilities developed protocols for alternate route selection, including assessing the costs to acquire the right-of-way on alternate routes based on land use and other factors. He noted a utility company cannot conduct an alternate route study without physically going to the property. According to Rogers, if a selected route goes through the middle of a landowner's property, the utility will have to "pay a heck of a lot more for it than if [it] go[es] along property lines." He stated studies show damages to the remainder of such properties range from ten to thirty-five percent.
Relying on Major's appraisal and the estimated fifteen percent in damaged value to the remaining acreage, Rogers estimated the total right-of-way acquisition costs, including damages, was $64,120 for the Northern Route, $182,960 for the Middle Route, and $29,100 for the Southern Route. He further calculated total cost estimates, which included costs **181 for construction, engineering, and right-of-way acquisition for each route: $271,200 for the Northern Route, $364,200 for the Middle Route, and $292,700 for the Southern Route. Rogers stated there would be no damage to the remainder using the Southern Route. Rogers indicated his alternate route analysis showed the Southern Route was preferable to the Middle Route in terms of cost, tap access, aesthetics, and structures.
Piedmont presented testimony that it considered environmental impact, land use, impact to individual landowners, costs for the route, and visual impact in selecting the Middle Route. Further, although the timeframe is disputed, it is clear that Piedmont did present the Oiens with three route proposals, including the Southern Route and the Northern Route.[8] Ultimately, Piedmont elected to stay with the Middle Route because Cobb determined it was shorter, straighter, and less expensive than the Southern Route. See Bookhart v. Cent. Elec. Power Co-op. , 219 S.C. 414, 432, 65 S.E.2d 781, 789 (1951) (affirming the trial court's conclusion that "[e]conomic and engineering considerations require [transmission] lines to be constructed as nearly straight as practicable"). Significantly, the Southern Route would have required Piedmont to construct costly angled poles, as well as incur additional costs to work around the pond and any wetlands issues. While the land acquisition costs are disputed, Piedmont relied on Graydon's appraisal. Thus, although Piedmont did not apply the presented "industry standard" in precisely the manner the Oiens' right-of-way acquisitions expert, Rogers, might have, even Rogers admitted that if Piedmont applied the Southern I **182 factors, it did not abuse its discretion in selecting the Middle Route. See Southern I , 305 S.C. at 517, 409 S.E.2d at 434.
Evidence in the record supports the circuit court's finding that Piedmont exercised its discretion in selecting the Middle Route through a rational decision making process supported by a proper factual basis. Since Piedmont in no way "acted in bad faith, fraudulently, or with a clear abuse of discretion," the circuit court properly denied OFI's request for injunctive relief. See id. at 515, 409 S.E.2d at 433.
II. Factual Findings and Legal Conclusions
OFI argues the circuit court's erroneous findings of fact and conclusions of law resulted in a misapplication of Southern I and Southern II . Although we disagree that the circuit court misapplied the case law, we *655 vacate one contradictory finding as discussed below.
OFI argues Finding 17 is not supported by the record. We disagree.
17. [Piedmont] presented testimony concerning the three proposed routes across [the Property]. The [N]orthern [R]oute was rejected by [OFI] as being too close to the home site where [the Oiens] proposed to build their home. The [S]outhern [R]oute required several bends in the transmission line[,] which are expensive. In addition, it requires engineering to cross the pond on the southern tract of [the Property]. Also, because [Mr.] Oien restricted access to [the Property], neither [Piedmont] nor [the City] completed the [S]outhern [R]oute engineering plan. All parties acknowledged that the [S]outhern [R]oute would be more expensive from an engineering standpoint and that the necessary poles could be viewed from the only house on the two tracts of [the Property]. Running the transmission lines around the pond could involve the Corps of Engineers or the Environmental Protection Agency.
Marc Regier, Utilities Director for the City, described his interactions with the Oiens as "pleasant" and "good." However, Regier described Major as "agitated." Todd testified Mr. Oien gave him permission to have the City's surveyors come out to the Property to stake the Middle Route. Nevertheless, Major subsequently accused Todd of trespassing. Mr. Oien **183 complained a surveyor went on the Property without permission, which he claimed constituted a trespass. OFI seeks to mitigate this behavior on appeal by arguing that section 28-2-70 of the South Carolina Code (2007) granted Piedmont the ex parte right to access the Property to perform studies.[9] While this is a correct citation of the statute, it does not render the circuit court's restricted access finding erroneous. Because evidence in the record supports the circuit court's finding that Mr. Oien (and his agent, Major) restricted access to the Property, we find no error as to Finding 17.
As to Finding 26, OFI argues the circuit court erred in relying on Bookhart because it was overruled by our supreme court in Southern II . We disagree.
26. "Economic and engineering considerations require [transmission] lines to be constructed as nearly straight as practicable, and there is no other feasible route for the line except the route across the lands in question, because any other route would increase the length of the line by several miles, and the cost would be substantially increased by reason of the additional guy wires, anchors[,] and appropriate structures[,] which would be necessitated at each of four additional angles." Bookhart v. Cent. Elec. Power Co-op. , 219 S.C. 414, 432, 65 S.E.2d 781, 789 (1951).
Based on our analysis of the Oiens' request for injunctive relief, see supra Issue I, Finding 26 is not erroneous.
Further, our review of Southern II , does not suggest that our supreme court overruled Bookhart . Bookhart affirmed the trial court's conclusion:
[T]here is no other feasible route for the line except the route across the lands in question, because any other route would increase the length of the line by several miles, and the cost would be substantially increased by reason of the **184 additional guy wires, anchors and appropriate structures which would be necessitated at each of four additional angles.
219 S.C. at 432, 65 S.E.2d at 788-89. In Southern I , this court determined safety, reliability, aesthetics, and cost were legitimate criteria for a condemning authority to consider as part of a rational decision making process and valid exercise of discretion. 305 S.C. at 516, 409 S.E.2d at 433. In Southern II , our supreme court agreed with this court's analysis of the abuse of discretion question in Southern I . 311 S.C. at 34, 426 S.E.2d at 751.
*656 Regarding Finding 29, OFI argues that because the industry standard identified by Rogers is not contradicted in the record, the circuit court had no factual basis to support its rejection of the industry standard analysis.
29. [OFI]'s expert witness, William Rogers, testified about the procedure for right-of-way acquisition at [CEPC] and other entities Mr. Rogers has worked for. However, the Court finds that there is no legal requirement for [Piedmont] to conform to the standard created by Mr. Rogers[,] which involves numerous written and detailed alternate route studies. Further, Mr. Rogers admitted in his testimony that, if [Piedmont] considered the factors laid out in [ Southern I ], then it had not abused its discretion, even if [Piedmont] did not perform written alternate routes.
Because OFI did not cite to any authority and failed to present further argument as to how this ruling was an abuse of the circuit court's discretion or otherwise legally erroneous, we find it has abandoned this issue on appeal. See Rule 208(b)(1)(D), SCACR (requiring "discussion and citations of authority" for each issue in an appellant's brief); Broom v. Jennifer J. , 403 S.C. 96, 115, 742 S.E.2d 382, 391 (2013) (finding an issue abandoned when the party's brief cited only one family court rule and presented no argument as to how the family court's ruling was an abuse of discretion or constituted prejudice). In any event, as noted above, Rogers's own testimony provides a factual basis for the circuit court's finding.
OFI further argues Finding 29 demonstrates the circuit court misapprehended Rogers's testimony. We disagree.
**185 Our review of the record reveals the circuit court accurately summarized Rogers's testimony. Rogers explained that if Piedmont mentally or verbally conducted an alternate route analysis, which he believed would be a difficult thing to do, then it did not abuse its discretion in selecting the Middle Route. While logic dictates that written analyses would be preferable, we are unable to find that either this court or our supreme court has specifically required that a condemning authority must present a writing to satisfy a finding that it used a rational decision-making process in considering alternate routes. In Southern I , this court explained:
The record indicates that although Santee Cooper asserted it utilized the criteria of safety, reliability, cost, and aesthetics in selecting a route[,] no concrete consideration was given to land acquisition cost. Santee Cooper witnesses testified they assumed all land in the general area was worth the same. When Santee Cooper employees considered the alternate routes proposed by Southern, their cost estimates presented to the board of directors did not include land acquisition costs. No notes or memoranda were kept by Santee Cooper employees of their analysis. The decision making process was departmentalized with the need for a transmission line decided by system planning; the route chosen by the design department; and the right of way department was required to secure the property for the chosen route.
305 S.C. at 515-16, 409 S.E.2d at 433. Although it would have been difficult for Piedmont to have adequately considered all of the necessary factors-environmental impact, land use, impact to individual landowners, costs for the route, and visual impact-with regard to all three routes without any written notes, memoranda, or subsequent reports, based upon Rogers's testimony, as well as the facts of this particular case, we find no error.[10]
OFI argues Finding 32 is contradicted by Finding 33's statement, "Based upon the manner in which Piedmont conducted **186 its alternate route analysis, the Court does not find [the Oiens'] challenge to be brought in bad faith." We agree.
32. Finally, the Court finds that [OFI] brought this action ..., not for a legitimate purpose, but in an attempt to reroute the transmission line off of [the Property].
*657 Mr. Oien admitted that their goal was to keep [Piedmont] from building the transmission line across [the Property]. Further, although [OFI] presented evidence attempting to show its preferred route, it failed to present any evidence that [Piedmont] abused its discretion in choosing the location of the route.
33. S.C. Code § 28[-]2[-]510(A) allows this Court to award [Piedmont] reasonable costs and litigation expenses if it finds [OFI] did not raise and litigate the challenge to condemnation in good faith. Based upon the manner in which [Piedmont] conducted its alternate route analysis, the Court does not find [OFI's] challenge to be brought in bad faith.
At trial, the following colloquy ensued during Mr. Oien's cross-examination:
Q: So you guys don't really want any transmission line on [the Property] at all?
A: We already have one that spans the entire width of [the Property]. We just didn't want another one.
Q: That's what I meant. So you don't want another one?
A: We don't.
Q: This is really about you and your wife [ ] not want[ing] another transmission line on [the Property]?
A: That's correct, and I don't think you would be very comfortable with a transmission line across your property.
Aside from this line of questioning, the record demonstrates OFI presented evidence showing it preferred the Southern Route; however, the record also provides support for Piedmont's position that OFI acquiesced as to the Middle Route, thus stopping the surveys and further studies. Moreover, in Finding 35, the circuit court explained:
35. The alleged grounds for [its] challenge to the condemnation show [OFI]'s intent. Thus, the grounds were abandoned. The abandoned grounds were [ ( ]1) the proposed **187 taking was not necessary; (2) the proposed taking is not reasonably calculated to fulfil[l] a public purpose, rather, the proposed taking has been initiated to further arbitrary and capricious decision and actions taken by [Piedmont]; (3) the proposed taking is not for public use.
In Finding 37 of its amended order, the circuit court concluded "The single motivating favor for [the Oiens] was to force Piedmont to relocate the transmission line to the [S]outhern [R]oute or to avoid [the Property] altogether." We agree that these findings are at odds with the referenced portion of Finding 33. Accordingly, we vacate Finding 33.
Finally, OFI argues Finding 38 is also contradicted by Finding 33.
38. The Court finds that forcing a public utility to locate a transmission line where the landowner wants it by challenging the condemnation is not good faith.
Vacating Finding 33 resolves this inconsistency as well.
Conclusion
We affirm the circuit court as to Issue I. We further affirm the circuit court's amended order as to Findings 17, 26, 29, 32, 35, 37, and 38. We vacate Finding 33.
AFFIRMED IN PART, VACATED IN PART.
HUFF and GEATHERS, JJ., concur.

305 S.C. 507, 409 S.E.2d 428 (Ct. App. 1991), aff'd as modified by 311 S.C. 29, 426 S.E.2d 748 (1993) (Southern I and Southern II , respectively).

In 2012, the Oiens transferred the Property to OFI, a limited liability company the Oiens created to hold their investment properties.

The construction of the new substation was completed in April 2014.

However, Marc Regier, the City Utilities Director, testified the Oiens told him that they preferred the Northern Route.

The transmission line has been constructed and energized. At the oral argument on the merits, the court repeatedly asked what the Oiens were seeking through the continuing litigation. The response: "Take the line down and do a new survey ... Do a new route analysis."

The circuit court noted, "Contrary to the authority's expert, who I thought was very credible[,] that there were no damages to the remainder, I thought that was almost beyond believability in the sense you can build a high-rise transmission line through the middle of somebody's property, especially as pristine as [the Property] is[,] and there not be any damages."

On cross-examination, Major testified that in determining the diminution in value, he used comparable sales, jury verdicts for contested right-of-way cases, the opinion of an Alabama auctioneer, and aesthetics.

At oral argument, Piedmont's counsel summarized the efforts made to accommodate the Oiens: Todd Guy presented the Oiens' Southern Route request to engineer Alan Cobb, who began to draw a potential line. "Then, the Oiens said, 'No, we don't want it to go there because it puts us too close to the neighbors-it takes some bushes down and the neighbors will be there' ... So at that point, he [Cobb] quit drawing the line." Next-at the Oiens' request-Guy went back to Alan Cobb and asked him to look at the Northern Route. But the Oiens rejected the Northern Route because it ran too close to the house. Thus, the Oiens said, "[G]o with the Middle." The Oiens then asked that the Middle Route be adjusted to avoid the removal of certain oak trees; the line was adjusted. These efforts occurred before forester Major became involved and before Mr. Oiens' voice message reporting that the Oiens wanted "to stay with what you have right now that you've originally drawn up."

See S.C. Code Ann. § 28-2-70(C) (2007) ("The condemnor shall have the authority, after reasonable notice to the landowner, to enter upon the real property in which an interest is proposed to be acquired for the purpose of making a survey, determining the location of proposed improvements, or making an appraisal. In the event a landowner refuses to allow entry, the circuit court may issue an ex parte order enforcing this section. A landowner shall have no cause of action for trespass arising out of the exercise of authority pursuant to this section.").

There can be no doubt that the Oiens' equivocating behavior complicated the route analysis process in this matter. Both the City's and Piedmont's efforts to accommodate the Oiens, as well as Mr. Oien's instructions "to stay with what you have right now that you've originally drawn up" voicemail make it difficult to find otherwise.