# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 21-778

**LAFAYETTE CITY-PARISH CONSOLIDATED GOVERNMENT**

**VERSUS**

**LUCILE B. RANDOL HEIRS, L.L.C.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20212515
HONORABLE MICHELLE M. BREAUX, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, D. Kent Savoie, and Van H. Kyzar, Judges.

**REVERSED AND REMANDED.**

Camille Bienvenu Poché
Babineaux, Poché, Anthony & Slavich, L.L.C.
P. O. Box 52169
Lafayette, LA 70505-2169
(337) 984-2505
COUNSEL FOR PLAINTIFF/APPELLANT:
    Lafayette City-Parish Consolidated Government

Michael D. Hebert
Becker & Hebert, LLC
201 Rue Beauregard
Lafayette, LA 70508
(337) 233-1987
COUNSEL FOR PLAINTIFF/APPELLANT:
    Lafayette City-Parish Consolidated Government

Gregory J. Logan
The Logan Law Firm
P. O. Box 52704
Lafayette, LA 70505
(337) 406-9685
COUNSEL FOR PLAINTIFF/APPELLANT:
    Lafayette City-Parish Consolidated Government

Gary McGoffin
Durio, McGoffin, Stagg & Ackermann
P. O. Box 51308
Lafayette, La 70505
(337) 233-0300
COUNSEL FOR DEFENDANT/APPELLEE:
    Lucile B. Randol Heirs, LLC

**KYZAR, Judge.**

The plaintiff, Lafayette City-Parish Consolidated Government, appeals from a trial court judgment sustaining a peremptory exception of unconstitutional lack of public necessity, filed on behalf of the defendant, Lucile B. Randol Heirs, LLC, and dismissing its expropriation petition with prejudice. For the following reasons, we reverse and remand.

## FACTS AND PROCEDURAL HISTORY

Pursuant to the Louisiana Constitution and state law, the Lafayette City-Parish Consolidated Government (LCG) is authorized to expropriate private property, whenever it is unable to reach an amicable agreement with the property's owner, through a declaration of taking if the property is necessary for a public purpose such as drainage. La.Const. art. 1, § 4(B)(2)(b)(iii); La.R.S. 19:139(A). At issue in this matter is LCG's quick taking of 16.054 acres belonging to Lucile B. Randol Heirs, LLC (Defendant) for the construction of two detention ponds along Lateral 7 of the Isaac Verot Coulee.

In accordance with the statutory requirements of La.R.S. 19:139.1, LCG filed a petition for expropriation on May 14, 2021, stating that Defendant's property (Lot 19) was being expropriated for the construction of a drainage project:

> [F]or the purposes of the improvement of drainage in or for, without limitation, the Lake Farm Road and/or the Isaac Verot Coulee, Lateral 7 area of Lafayette Louisiana. Specifically, the Project is part of a comprehensive parish-wide drainage detention program designed to reduce flood risks in Lafayette Parish through the use of detention pond facilities and their related appurtenances. To that end, LCG has determined that the Property is in an ideal location for placement of a detention pond to assist in the drainage of the Lake Farm Road area and the Kingshaven [sic] Subdivision.

The petition stated that the drainage project was being undertaken for a public purpose "for the improvement of drainage as well as public safety and the protection from flooding through, without limitation, the design and construction of a series of

detention ponds." It further stated that the property being expropriated was necessary for the project.

Attached to the petition were the following documents: a certified copy of LCG's ordinance declaring that the drainage project was a public necessity and authorizing the expropriation of the property; a certificate signed by LCG's supervising engineer declaring that he had "fixed the right-of-way for the Project in a manner sufficient in my judgment to provide for the public interest, safety, and convenience" and that the project's location and design were "in accordance with the best modern practices adopted in the interest of the safety and convenience of the public[;]" an appraiser's itemized statement estimating the full extent of Defendant's loss in the event of the expropriation as $1,400,000.00; and an April 27, 2021 letter of notification sent to Defendant regarding LCG's intent to expropriate Lot 19, as well as an April 28, 2021 return receipt.

On May 17, 2021, the trial court, after considering the petition, ordered LCG's expropriation of Lot 19 effective upon its deposit of the $1,400,000.00 in the registry of the court. The trial court further ordered the clerk of court to notify Defendant of the taking and ordered service of the notice, along with certified copies of its order, LCG's petition, and the clerk's receipt for the deposit, to be served on Defendant by the sheriff. The clerk of court's receipt and notice were dated May 17, 2021.[1]

In response to the court-ordered expropriation, Defendant filed two peremptory exceptions of unconstitutionality on June 8, 2021. In its first exception, which is not at issue, Defendant argued that the LCG quick-taking statute, La.R.S. 19:139, et seq., was unconstitutional as Senate Bill 497, which amended La.R.S. 19:139 to allow LCG the use of quick taking "for the construction, repair, or

---

[1] Although the record is silent as to the date of service on Defendant, Defendant's memorandum in support of its peremptory exceptions indicates that it was served on June 2, 2021.

2

enhancement of drainage, roads, or bridges," violated the constitutional one-object requirement for legislative bills.

In its second exception, which is the subject of this appeal, Defendant argued that LCG's expropriation of Lot 19 was unconstitutional due to a lack of public necessity as it already owned property on which it could locate the two detention ponds. It argued that LCG owned Beaullieu Park, which was located adjacent to Lot 19 and that the detention ponds could be located on that portion of Beaullieu Park where its baseball fields were located. Defendant further argued that the proposed detention ponds would not resolve LCG's "existing drainage problems due to the bottlenecks created by the undersized and poorly maintained downstream culverts located under Verot School Road near its intersection with Ambassador Caffery Parkway."

Following an August 10, 2021 hearing, the trial court overruled Defendant's first exception, but took the second exception under advisement. Thereafter, on October 22, 2021, the trial court rendered judgment sustaining Defendant's exception in the form of written reasons for judgment. It held that although drainage is a public purpose, "Lafayette City Parish Consolidated Government has not complied with the standards set forth in La.R.S. [19]:139 et seq."

Subsequently, LCG moved for a suspensive appeal from the trial court's judgment. However, once the record was received on appeal, we determined that we lacked jurisdiction to consider LCG's appeal as the trial court judgment lacked the proper decretal language to dismiss its petition. Upon LCG's request, we stayed its appeal and remanded the matter to the trial court for the limited purpose of rendering a proper final judgment. *Lafayette City-Par. Consol. Gov't v. Lucile B. Randol Heirs, L.L.C.*, 21-778 (La.App. 3 Cir. 1/12/22) (unpublished opinion). Thereafter, the trial court rendered a written judgment on January 4, 2022, sustaining

3

Defendant's peremptory exception of unconstitutional lack of public necessity and dismissing LCG's petition for expropriation.

On appeal, LCG asserts the following assignments of error:

1. The District Court erred by failing to apply the correct legal standard, i.e., whether LCG abused its large discretion by acting in bad faith or arbitrarily and capriciously in the expropriation of the Property.

2. The District Court erred by failing to place on Randol the heavy burden of proving that LCG abused its large discretion by acting in bad faith or arbitrarily and capriciously in the expropriation of the Property.

3. The District Court erred by granting the Peremptory Exception of Unconstitutionality as to the alleged lack of public necessity because it failed to apply the correct legal standard and failed to place the requisite burden of proof on Randol.

4. The District Court erred by finding that LCG did not satisfy the "best modern practices" component of La. R.S. 19:139.1(3)(b) without enunciating a definition for "best modern practices" and by incorrectly interpreting and applying the term.

## OPINION

At the outset, we note that the mandatory procedural rules applicable to the Lafayette quick-taking statute are set forth in La.R.S. 19:139-139.7. Louisiana Revised Statutes 19:139.5(A) provides that a defendant contesting the validity of LCG's expropriation on the grounds that their property was not being expropriated for a public use, does so through a motion to dismiss. La.R.S. 19:139.5(A). The failure to file this motion within fifteen days of being served with notice of the expropriation "constitutes a waiver of all defenses to the suit except claims for compensation or damages." La.R.S. 19:139.5(B).

In this instance, Defendant challenged LCG's expropriation via a peremptory exception. Based on the requirements of La.R.S. 19:139.5, we find that the peremptory exception was not the proper procedural vehicle through which Defendant could challenge LCG's expropriation. However, as noted by the court in

4

*Lomont v. Myer-Bennett*, 16-436, p. 5 (La.App. 5 Cir. 12/14/16), 210 So.3d 435, 441, *writ denied*, 17-88 (La. 2/24/17), 216 So.3d 59:

> [I]n situations where a mistitled pleading clearly identifies the issue being raised, and adequately sets out the mover's arguments on that issue and the relief requested, such that notice and due process requirements are sufficiently satisfied, the Court, in the interest of justice, will routinely look beyond the title of the pleading and address the merits of the issue raised.

In this instance, it is clear that Defendant is contesting the public necessity of LCG's expropriation of Lot 19. Accordingly, we will review this matter as a motion to dismiss.

The Fifth Amendment of the United States Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." In Louisiana, "[e]very person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property." La.Const. art. 1, § 4(A). However, private property is subject to expropriation by a public entity when it is needed "for public purposes" and when just compensation is paid to the owner. La.Const. art. 1, § 4(B)(1). A drainage project intended for the "benefit of the public generally[,]" counts as a "public purpose" pursuant to La.Const. art. 1 § 4(B)(2)(iii).

The right of the LCG to expropriate private property for drainage purposes by a declaration of taking is set forth in Part III-I of Title 19 of the Louisiana Revised Statutes. Louisiana Revised Statutes 19:139 provides:

> A. When the governing authority cannot amicably acquire property needed by the city of Lafayette and the parish of Lafayette for the Kaliste Saloom Road Widening Project or for the construction, repair, or enhancement of drainage, roads, or bridges, it may acquire the same by expropriation and may acquire the property prior to judgment in the trial court fixing the amount of compensation due to the owner of the property.
>
> B. At least fifteen days prior to filing a petition for expropriation, the governing authority shall notify the owner or owners by certified

mail, return receipt requested, of its intention to expropriate the property pursuant to this Part. The letter of notification shall also inform the owner that if, within fifteen days after being served with the notice of suit, he does not object to the taking on the ground that it is not for a public purpose, he will waive all defenses to the taking except claims for compensation or damages. A copy of this Part shall be enclosed with the letter of notification.

C. Except as otherwise provided in this Part, such expropriation by the governing authority shall be conducted in the manner that the Department of Transportation and Development may expropriate property for highway purposes, as set forth in R.S. 48:441 through 460.

D. As used in this Part, the term "property" means any portion of immovable property, including servitudes, rights-of-way, and other rights in or to immovable property; the term "governing authority" means the city of Lafayette and parish of Lafayette; and the term "project" means the Kaliste Saloom Road Widening Project or the construction, repair, or enhancement of drainage, roads, or bridges.

In the seminal case on quick taking, *Red River Waterway Commission v. Fredericks*, 566 So.2d 79, 82-83 (La.1990) (footnotes omitted), the supreme court laid out the factors to be considered in an expropriation under a quick-taking statute:

> The highway quick-taking statute, which was patterned after the Federal Declaration of Taking Act, 40 U.S.C. § 258a-e, is applicable to the expropriation procedure in the present case by virtue of La.Rev.Stat. 34:2309(4). Under the highway quick-taking statute there are three issues for determination by the court: (1) whether the property was taken for a highway (or waterway in this case) purpose, (2) whether the expropriating agency acted arbitrarily, capriciously or in bad faith in determining the necessity of the taking, and (3) whether the compensation was adequate. *State through Department of Highways v. Jeanerette Lumber & Shingle Co.*, 350 So.2d 847 (La.1977). Only the second issue is presently before this court.

> The question of the necessity of an expropriation lies within the discretion of the Legislature, which may delegate the power of selecting the location and extent of the land to be expropriated to the public agency in charge of the work. The decision of the agency may not be set aside as long as it acts reasonably and in good faith in determining that the taking is necessary. 1A Nichols, *The Law of Eminent Domain*, § 4.11[3] (J. Sackman rev. 3d ed. 1985).

> Questions such as the location of the expropriation, the extent of the property to be taken, the nature of the title to be taken, and the wisdom of pursuing the particular improvement project relate to the issue of the necessity of the taking. M. Dakin & M. Klein, *Eminent Domain in Louisiana* § 8C (1970). The landowner who contests the

6

necessity of the taking must prove that the legislatively authorized expropriator exercised its discretion arbitrarily, capriciously or in bad faith. *State through Department of Highways v. Jeanerette Lumber & Shingle Co.*, 350 So.2d 847 (La.1977). The standard is whether the expropriator, in selecting the location and extent of the property to be expropriated, acted in bad faith or so capriciously or arbitrarily that its action was without an adequate determining principle or was unreasoned. *United States v. Carmack*, 329 U.S. 230, 243, 67 S.Ct. 252, 258, 91 L.Ed. 209 (1946). Thus, the landowner attacking the taking must show that the expropriator exercised its large discretion without consideration or adjustment with reference to principles, circumstances or significance. *Id.* at 243 n. 14, 67 S.Ct. at 258 n. 14. Criteria to be considered by the expropriator include the availability of an alternate route, costs, environmental factors, long-range area planning, and safety considerations. Nichols, *supra*, at § 411; *Hillsborough County v. Sapp*, 280 So.2d 443 (Fla.1973). The expropriating agency may abuse its discretion by acting without considering and weighing the relevant factors, that is, by acting arbitrarily. *See Florida Power & Light Co. v. Berman*, 429 So.2d 79 (Fla.Dist.Ct.App. 4th Dist.1983); *Florida Power Corp. v. Gulf Ridge Council*, 385 So.2d 1155 (Fla.Dist.Ct.App. 2d Dist.1980).

Based on the forgoing jurisprudence, it is presumed that the location chosen by the expropriating authority is the "best and most feasible[]" location for the proposed project. *Acadian Gas Pipeline Sys. v. Nunley*, 46,648, p. 10 (La.App. 2 Cir. 11/2/11), 77 So.3d 457, 463, *writ denied*, 11-2680 (La. 2/10/12), 80 So.3d 487. Moreover, the party contesting the expropriation must prove by clear and convincing evidence that the expropriating authority, "in selecting the location and extent of the property to be expropriated, acted in bad faith or so capriciously or arbitrarily that its action was without an adequate determining principle or was unreasoned." *Red River Waterway Comm'n*, 556 So.2d at 83.

Here, the trial court found, as a matter of fact, that drainage is a public purpose. Thus, the only remaining question is whether LCG acted arbitrarily or capriciously or in bad faith in determining the necessity of the taking because it "exercised its large discretion without consideration or adjudgment with reference to principles, circumstances, or significance." *Id.*

7

This court, in *Calcasieu-Cameron Hospital Service District v. Fontenot*, 628 So.2d 75, 79 (La.App. 3 Cir. 1993), *writ denied*, 94-168 (La. 3/18/94), 634 So.2d 854, expounded further on this issue:

> Criteria to be considered by the expropriator include the availability of an alternate route, costs, environmental factors, long-range area planning, and safety considerations. The expropriating agency may abuse its discretion by acting without considering and weighing the relevant factors, that is, by acting arbitrarily. *Red River Waterway Comm'n*[] *v. Fredericks*, 566 So.2d 79 (La.1990), and authorities cited therein. However, the mere availability of a feasible alternative location is not, by itself, an indication that the expropriator has acted arbitrarily or capriciously in making its selection. *Faustina Pipe Line Co. v. Levert-St. John, Inc.*, 463 So.2d 964 at 969 (La.App. 3d Cir.), *writ denied*, 466 So.2d 1301 (La.1985), quoting *Louisiana Resources Co. v. Stream*, 351 So.2d 517 (La.App. 3d Cir.1977).

A trial court's finding of facts on the issue of public necessity will not be reversed absent a finding of manifest error or clear error. *Id.* However, the proper interpretation of a statute is a question of law which is reviewed on appeal pursuant to a *de novo* standard of review, with the appellate court giving no deference to the trial court's interpretation. *Zillow, Inc. v. Bealer*, 21-545 (La.App. 3 Cir. 2/2/22), 333 So.3d 854, *writ denied*, 22-378 (La. 5/10/12), 337 So.3d 908. With regard to statutory interpretation:

> [I]t is well settled that statutory interpretation begins with the language of the statute itself. See **Brown v. Adair**, 2002-2028 (La. 4/9/03), 846 So.2d 687, 689. In considering statutory language, the words of a law must be given their generally prevailing meaning; and words of art and technical terms must be given their technical meaning when a law involves a technical matter. La. C.C. art. 11. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La. C.C. art. 9. When the words of the law are ambiguous, however, their meaning must be sought by examining the context in which they occur and the text of the law as a whole. La. C.C. art. 12. When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. La. C.C. art. 10.

*Boone Servs., LLC v. Ascension Par. Gov't*, 21-524, p. 9 (La.App. 1 Cir. 12/30/21), ___ So.3d ___, ___.

In contesting the expropriation, Defendant asserted that LCG failed to prove a public necessity for the taking because its certification failed to comply with the best modern practices standard as required by La.R.S. 19:139.1(3)(b)(ii). It based its argument on its claim that the detention ponds would not resolve LCG's drainage issues and because LCG's expropriation was unnecessary since the ponds could be placed on property it already owned, Beaullieu Park, which is located adjacent to Lot 19.

Fred Trahan, the supervising engineer of LCG's public works department, testified that the location and design of the proposed detention ponds was in accordance with the best modern practices, and the decision to locate the ponds on Lot 19 was based on sound engineering principals. He stated that the best modern practice for dealing with an extreme under-capacity channel such as Lateral 7 was by removing water from the lateral and storing or parking it in a detention pond and then releasing it later when the lateral's capacity was not overextended.

Mr. Trahan admitted that there was no adopted departmental best-modern-practices standard guiding his work, nor does his department have handbooks or reference books that refer to the best modern practices for detention ponds. He further stated that the term "best modern practices" was not included in the engineering profession's code of conduct. Rather, Mr. Trahan testified, engineers are required to meet an acceptable minimum standard of care. He opined that best modern practices meant that he should analyze the project using state of the art technology and data and then design it using his best engineering judgment in accordance with the most up-to-date drainage practices.

Other than testimony from Mr. Trahan regarding LCG's lack of an adopted best-modern-practices standard, Defendant offered no explanation as to the meaning of "best modern practices." Instead, its expert, Robert Guidry, a civil engineer and

9

the son of one of Defendant's owners, offered his opinion as to what he considered the best modern practices for this drainage project. He opined that any drainage project in this area should be designed to handle a 100-year storm, that LCG could better address the drainage issues by improving the entire coulee system such that it could handle a 100-year storm; and that LCG has failed to adopt a comprehensive parish-wide drainage plan. However, Mr. Guidry admitted that the use of detention ponds was a best modern practice.

In finding that LCG failed to comply with the statutory requirements of La.R.S. 19:139 et seq., the trial court focused on the "best modern practices" aspect of La.R.S. 19:139.1(3)(b)(ii). Although it failed to define the term, the trial court held that Mr. Trahan's certification that his location and design of the proposed improvements was in accordance with the best modern practices was invalid because LCG lacked such a standard by which to guide his certification.

While the trial court stated that the "best modern practices" requirement was implemented in the 2018 amendment[2] to La.R.S. 19:139, this is incorrect as La.R.S. 19:139.1, which contains the best modern practices language, has not been amended since its 2009 enactment. We note that the language found in La.R.S. 19:139.1(3)(b)(ii) mirrors that found in DOTD's quick taking-statute, La.R.S. 48:442(3)(b), (c), enacted by 1954 La. Acts No. 107, § 1, which tracked the language of La.R.S. 48:192 (1950) before it was amended by 1955 La. Acts No. 40, § 3. Prior to its 1955 amendment, La.R.S. 48:192 provided, "The department shall adopt and employ the best modern practices in the location and design of highways, in the interest of the safety and convenience of the traveling public."

_____

[2] 2018 La. Acts, No. 419, §1.

10

The source of La.R.S. 48:192 (1950) was 1942 La. Acts No. 4, § 38, which created the Department of Highways and established the State Highway System. Section 38 of Act No. 4 (emphasis added) provided, in part, as follows:

> The State highway system shall consist of those highways which have heretofore been included in the State highway system by any Act of the Legislature, together with those highways which may hereafter be included in said system by order of the Director of Highways and approved by the Board of Highways, and those highways which may hereafter be included by Act of the Legislature.
>
> In the location and design of highways it shall be the duty of the Department *to adopt and employ the best modern practices in the interest of the safety and convenience of the traveling public.*

Following its 1955 amendment, La.R.S. 48:192(A) provided, in part:

> The board of highways shall immediately establish construction standards relating to the width, type, right of way and related matters for each system of highways, following the best engineering practices and experiences for the construction of all roads, bridges, drainage structures or other work which may be necessary from time to time on the three road systems established hereby, which said standards shall comply with all federal regulations necessary to obtain federal aid for road and bridge construction in Louisiana.

The current version of La.R.S. 48:192(A) provides as follows:

> The department shall immediately establish and maintain design standards for the functional classifications of state highways, following the best engineering practices and experiences for the construction of all roads, bridges, drainage structures, or other work which may be necessary from time to time which said standards shall comply with all federal regulations necessary to obtain federal aid for road and bridge construction in Louisiana.

In 1968, the legislature further enacted La.R.S. 48:35, which provided the "[m]inimum safety standards of highway design, maintenance and construction[,]" as follows:

> The department of highways shall adopt minimum safety standards with respect to highway design, construction and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway Officials. Hereafter, the state highway system and all public roads, highways and streets under the

11

jurisdiction of any political subdivision of this state shall conform to such safety standards.

Currently, La.R.S. 48:35 provides in part:

A. The Department of Transportation and Development shall adopt minimum safety guidelines with respect to highway and bridge design, construction, and maintenance. These guidelines shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials allowing the flexibilities incorporated therein. Hereafter, the state highway system shall conform to such safety guidelines.

. . . .

C. The Department of Transportation and Development shall adopt specific minimum safety guidelines with respect to highway and bridge design, construction, and maintenance for all public roads, highways, and streets under the jurisdiction of any political subdivision of this state and not in the state-maintained highway system. These guidelines shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials allowing the flexibilities incorporated therein. Prior to implementation by the department, the guidelines shall be submitted to the Senate and House committees on transportation, highways, and public works for review in accordance with the provisions of R.S. 49:950 et seq.

Based on the statutes quoted above, we find that the term "best modern practices" historically relates to the design and construction of highways in accordance with the best engineering practices and experiences as well as the minimum safety standards approved by the American Association of State Highways and Transportation Officials (AASHTO). Our review has turned up no similar standard pertaining to the design and construction of drainage projects, other than those constructed in conjunction with a highway construction project as provided by La.R.S. 48:192(A).

Reading La.R.S. 19:139.1(3)(b) *in pari materia* with La.R.S. 48:35(A) and La.R.S. 48:192(A), we find that "best modern practices," as it pertains to drainage projects, means that an engineer should utilize the best engineering practices and

12

experiences in locating and constructing the drainage project, in accordance with the engineer professional's acceptable minimum standard of care. Moreover, in *Carrier v. City of Amite*, 10-7, pp. 5-6 (La. 10/19/10), 50 So.3d 1247, 1250 (alterations in original), the supreme court held:

> Courts have held that experts may not rely on their own conclusions as authority in the absence of any objective support. *See Grdinich v. Bradlees*, 187 F.R.D. 77 (S.D.N.Y.1999) (holding the expert's testimony was without foundation because "[w]ithout 'industry standards' to rely upon, [the expert] seems to base his conclusions on his own authority"). Thus, Mr. Green's testimony does not establish the existence of any statutes, regulations, or industry standards which would support the finding of a duty on a retailer to fit bicycle helmets at the point of sale.

Accordingly, in the absence of statutory or industrial standards pertaining to drainage projects, we find that Mr. Guidry's opinions regarding the best modern practices LCG should follow in constructing this drainage project are merely his personal opinions.

In light of its misinterpretation of the term "best modern practices," we find that the trial court legally erred in finding that LCG failed to comply with the procedural requirements of La.R.S. 19:139.1(3)(b). Thus, we find that the trial court legally erred in finding that LCG acted arbitrarily, capriciously, or in bad faith in certifying that the location and design of the drainage project was in accordance with the best modern practices. Accordingly, we will now perform a *de novo* review.

### *De Novo Review*

According to the record, storm water in Lafayette Parish drains from various watershed areas into numerous coulees and from there into the Vermilion River. Once it reaches the Vermilion River, the water eventually drains into Vermilion Bay and from there into the Gulf of Mexico. The Isaac Verot Coulee[3] (the coulee) is a

---

[3] "Geologically speaking, a coulee is a gully or a ravine that is usually dry and was cut by water action. The term coulee comes from the Canadian French word *coulee*, derived from the

13

significant drainage channel in Lafayette Parish, consisting of numerous laterals or lesser channels that convey water from the watershed area to the coulee. At issue in this matter are Laterals 7 and 7C, which, according to the record, converge at channel marker 6408.24[4] located adjacent to Lot 19 and Beaullieu Park.

A detention pond is a pond designed to protect against and minimize flooding by storing or parking water which is in excess of the adjacent channel's capacity. The water is then released slowly back into the channel when the threat of flooding has passed. A detention pond is designed to remain dry except during storms. A community or localized detention pond is designed to collect storm-water runoff from a development or subdivision, whereas a regional detention pond is designed to lower the water surface of the adjacent channel and minimize the extent of flooding caused by the overtopping of that channel. A retention pond is designed to always hold water at less than its full capacity, with the remaining capacity utilized for detention following a storm.

Depending on the intensity of rain (inches by hour) that falls, a storm may be categorized as a 2, 5, 10, 25, 50, or 100-year storm. For every calendar year there is a statistical or percentage chance that each of these storms will occur. In one year, the chance of a 100-year storm occurring is 1% and a 50-year storm is 2%. In one year, the chance of a 2, 5, 10, or 25-year storm occurring is statistically greater than that of a 50 or 100-year storm. However, the fact that an area has already experienced a 50 or 100-year storm does not mean that no such storm will occur for

French word *couler,* meaning 'to flow."' https://www.washingtonnature.org/fieldnotes/2017-science-two-minute-takeaway-what-is-a-coulee#:~:text=Geologically%20speaking%2C%20a%20Ocoulee%20is,%2C%20meaning%20%E2%80%9Cto%20flow.%22 (last visited July 24,2022).

[4] A channel marker indicates the distance along a channel measured in feet.

the remainder of that year. According to HEC-RAS[5] modeling performed by Southeast Engineering for LCG, the existing water surface elevation above the mean sea level at channel marker 6408.24 is 27.60 feet for a 10-year storm, 28.95 feet for a 50-year storm, and 29.42 feet for a 100-year storm.

*Long-Range Planning*

Mr. Trahan testified that following back-to-back one-hundred-year storms on August 12-13, 2016, the reduction of flood risks became LCG's paramount goal. Thus, he stated that LCG implemented a comprehensive storm-water-management program, which included cleaning and maintaining concrete-lined channels; clearing the main drainage channels of debris and obstacles; clearing laterals of excess vegetation; reestablishing historical grade lines in existing detention ponds; and the implementation of a parish-wide detention program. He admitted that LCG has not yet adopted a comprehensive parish-wide drainage plan; however, he stated that it was in the process of developing such a plan.

Mr. Trahan testified that LCG's detention program involved locating sites that would be advantageous to flood-prone areas, vetting those sites through hydraulic studies, and constructing ponds on the chosen sites. He stated that he commenced evaluating the parish for potential detention sites in 2020, by developing a heat map which identified the most flood-prone areas based on flood-claim data compiled by the Federal Emergency Management Agency (FEMA). Mr. Trahan testified that once he identified potential locations, he provided information regarding those locations to Southeast Engineers, who performed hydraulic studies to determine the effect the proposed detention ponds would have on the water surface elevation in the adjacent channels during 10 and 50-year storms. He stated that of the ninety sites

---

[5] Hydraulic Engineering Center-River Analysis System software developed by the United States Army Corps of Engineers.

15

identified, approximately twenty-two have proven potentially beneficial in reducing flooding in the areas identified.

Due to the frequency of flooding along Lateral 7, Mr. Trahan testified that LCG devised a program to alleviate the flooding by placing four regional detention ponds along the lateral. Three of the four proposed detention ponds were to be located at Middlebrook Elementary, Digby Road, and Lake Farm Road, with the larger proposed pond located on Lot 19.[6] The fourth pond, located at Camellia Boulevard, already existed and was recontoured by LCG to provide greater storage volume. Mr. Trahan testified that hydraulic studies, including HEC-RAS modeling, determined that the cumulative effect of the four ponds would reduce the water surface elevation at channel marker 6408.24 by sixteen inches during a 10-year storm and just under a foot during a 50-year storm. He said that although the ponds would reduce the water surface elevation by less than one foot during a 100-year storm, the effect of this reduction would still be significant. Mr. Trahan testified that the extent of flooding during a 10 and 50-year storm without the benefit of the series of ponds would be greater than that shown on the inundation maps prepared by Mr. Guidry. Moreover, he stated that while Mr. Guidry's maps show the limits of the flooding, they did not indicate the depth of the flooding.

Mr. Trahan testified that the smaller pond[7] proposed for Lot 19 was intended to provide localized protection for the nearby Kings Haven and Ashland Park subdivisions. He explained that these subdivisions are prone to flooding because they were developed prior to the release of FEMA's current flood maps. As a result, he stated that homes located in these subdivisions were built three feet below the

---

[6] The larger pond covers seven acres.

[7] The smaller pond covers 3.5 acres.

current base flood elevation. Moreover, he said that the design requirements when the subdivisions were developed only required that their drainage systems be designed to handle a 2-year storm, rather than a 5-year storm as currently required. Mr. Trahan further testified because the subdivisions drain directly into Lateral 7, this results in higher water surface elevations in the lateral during storms. He stated that the effect of this is that runoff from the subdivisions is prevented from draining into the lateral, causing it to back up and flood the subdivisions' roads, yards, and homes. Mr. Trahan testified that the smaller detention pond would correct this problem because the subdivisions' drainage systems would be severed from the lateral and rerouted through a sub-surface drainage system to the pond. He stated that the pond would have the effect of reducing the water surface elevation in the subdivisions by more than a foot during 10, 50, and 100-year storms.

Despite the smaller pipe used in the drainage systems, Mr. Trahan opined that the drainage systems would be able to handle the runoff from larger storms. He explained that the pipes' performance was predicated on the size, depth, and water surface elevation achieved by the smaller pond, which would have a positive effect of conveying water through the pipes as long as the pond's water surface elevation was lower than that in the subdivisions.

Mr. Trahan testified that there would be no ponding in the streets during a 10-year storm because even should there be standing water at the drainage inlets, all of the water would eventually drain into the pond. However, in the event that the streets flooded during a larger storm, he stated that the flooding would not be so extensive that the subdivisions' water surface elevation reverted or equalized with the water surface elevation of Lateral 7. He explained that the smaller pond's banks, at twenty-eight feet due to being surrounded by a two-foot berm, would be higher than the water surface elevation caused by a 50-year storm, 27.96 feet, such that the pond

17

would not be overtopped by water from Lateral 7. Thus, he stated that the runoff from the subdivision would continue draining into the smaller pond.

According to Mr. Trahan, the larger pond would provide regional detention by removing water from Lateral 7 once it reached a certain elevation, thereby, reducing the water surface elevation in the lateral. He stated that a spillway located between the larger pond and Lateral 7 would be lowered right before the lateral exceeded its capacity, so that water would spill over from the lateral into the pond. He stated that parking the water in the pond would reduce the flow rate of water downstream, thus, lowering downstream water surface elevations.

Mr. Trahan explained that both ponds would be connected to Lateral 7C by check valves, which would remain open until the water surface elevation in the lateral exceeded that in the ponds. At that point, he said that the check valves would close, severing the ponds from the lateral. He stated that the check valves would reopen after the rainfall ended and the lateral's water surface elevation fell below the ponds' water surface elevation.

Mr. Trahan opined that it would be cost prohibitive to improve the coulee system working backwards from the Vermilion River because in addition to the improving every channel in the system, every road crossing would also have to be improved. He further explained that the effect of increasing an undersized channel's capacity was almost always an increase in the channel's water surface elevation. Thus, he stated that the cumulative effect of those improvements would be a rise in the water surface elevation of the coulee system as well as the Vermilion River. With regard to Lateral 7, Mr. Trahan testified that because the entirety of the lateral was impeded along its route to the coulee's main channel, widening or deepening the channel would push more water through the channel causing a rise in water surface elevations at downstream pinch points.

18

Based on the hydraulic study performed by Southeast Engineering, Mr. Trahan testified that the removal of the bridge at Verot School Road would cause a higher rate of flow downstream and an increase in the channel's water surface elevation, which is disallowed by FEMA. He further stated that the use of in-line detention ponds, which are located within the drainage right-of-way, would also cause a rise in downstream water surface elevations. He stated that the answer to drainage issues caused by an under-capacity channel was not to increase the channel's flow rate, but, rather, to park the water from the channel in a detention pond and then release it at a later time.

James Ricks, a civil engineer with Southeast Engineers, testified that his firm performed hydraulic evaluations of the proposed detention pond sites for LCG. He stated that he disagreed that LCG's drainage project should be designed to handle a 100-year storm. He explained that the repetitive flooding experienced by the Kings Haven and Ashland Park subdivisions was caused by 2-year or smaller storms and that LCG's aim was to remedy the flooding experienced by the subdivisions as a result of 2, 5, and 10-year storms.

Mr. Ricks testified that he believed that the detention ponds proposed for Lot 19 would provide significant relief to Lateral 7 and to the Kings Haven and Ashland Park subdivisions. He explained that although the effect of the smaller detention pond is not reflected in the HEC-RAS analysis, the benefits experienced by the subdivisions will be greater than that experienced at channel marker 6408.24 because their drainage systems will be severed from Lateral 7. He stated that the rerouting of their drainage systems to the smaller pond will provide a "significant low lying [sic] area for this flood water to accumulate and store," which it currently does not have.

19

According to Mr. Ricks, the HEC-RAS analysis revealed that the four regional detention ponds would reduce the flooding at channel marker 6408.24 during a 100-year storm from 29.42 feet to 28.52 feet. He further testified that the HEC-RAS analysis revealed that improvement of the two bridges crossing the coulee at Verot School Road and Ambassador Caffery would provide some reduction in water surface elevation upstream from the bridges. However, Mr. Ricks testified that the reduction was minor compared to that resulting from the four ponds, and the analysis revealed an increase in water surface elevation at some points downstream. He stated that this would have the effect of transferring the problem downstream, whereas the series of ponds would provide a benefit downstream as far as Youngsville.

Mr. Ricks explained that the flow of water along a channel is reduced when water is parked in a detention pond and then released very slowly through a small pipe. He stated that flow is equal to volume per the unit of time (cubic feet per second) and that in order to calculate a channel's water surface elevation it was necessary to know the rate of flow along the channel. Thus, Mr. Ricks testified that if a volume of water was taken from a channel and parked in a detention pond, there would be that much less volume of water in the channel, thereby, reducing the channel's water surface elevation as well as its flow rate. He further stated that a lower flow rate upstream would result in lower flow rates and water surface elevations downstream, with the effect of significant drainage improvements downstream.

Although LCG currently does not have a comprehensive parish-wide drainage plan, Mr. Ricks testified that it had contracted with a large firm to prepare such a plan. He further agreed that having such a plan would be a good practice. Despite

20

the lack of this plan, he stated that LCG has identified problem drainage locations in the parish.

As stated previously, Mr. Guidry opined that LCG's drainage project should be designed to handle a 100-year storm. He based his opinion on the fact that the high-water marks from the August 12 and 13, 2016 storms corresponded with the 100-year water surface elevations on the FEMA flood maps. He further opined that no flood relief would be gained by locating detention ponds on either Lot 19 or Beaullieu Park. He stated that based on the inundation maps he prepared from LCG's HEC-RAS analysis, flooding would still occur at channel marker 6408.24 during 10 and 50-year storms, with the water surface elevations reaching 26.38 and 27.97 feet, even with the benefit of the four detention ponds. Mr. Guidry testified that based on these water surface elevations, the ponds located on Lot 19 would be inundated because their banks, as shown in LCG's preliminary plans, would be twenty-six feet high, as would the bank of the redesigned Lateral 7C. Mr. Guidry testified that once inundated, the detention ponds would no longer provide storage, and the water overtopping their banks would drain directly into Laterals 7 and 7C. However, he admitted that surrounding the ponds with two-foot berms would prevent them from being inundated in 10 or 50-year storms.

Mr. Guidry opined that the smaller detention pond would provide no benefit to Kings Haven and Ashland Park because their drainage systems were only designed to handle a 2-year storm. He stated that during a 10 or 50-year storm, the drainage systems' hydraulic grade line, which is the pipe's pressure head measured in feet, would be two and one-half to seven feet and four to twelve feet, respectively, above the road elevation. Mr. Guidry explained that the hydraulic grade line in a good design should be at or below the road elevation. He stated that because the drainage systems' hydraulic grade line would be above the road elevation during a

21

10 or 50-year storm, water would collect in the pipes and then back up into the streets until it drained into Lateral 7. Mr. Guidry further opined that the berms surrounding the ponds would increase the risk of homes flooding in the lower sections of the subdivisions. He explained that the berms would prevent the water that was building up in the subdivisions, from pouring over the ponds' banks; thus, putting homes in the subdivisions at risk of flooding as the water, which would have nowhere to drain, continued to rise.

It was Mr. Guidry's opinion that LCG should adopt a comprehensive parish-wide drainage plan, which would take a larger view of LCG's drainage issues. He suggested that such a plan could include LCG's improvement of the entire coulee system so that it could handle a 100-year storm. He said that the detention ponds should be developed to LCG's current standards: 5-year storm for a residential detention pond, and 10-year storm for a commercial detention pond. Mr. Guidry testified that widening and deepening the coulee's channels would increase their storage capacity, with the effect of lowering their water surface elevations, as well as their flow rates. However, absent hydraulic modeling, taking into consideration the wider channels, he did not know if the improvements would cause a downstream rise in water surface elevations.

Mr. Guidry testified that if LCG chose to improve the coulee system as suggested, it should start downstream where the coulee empties into the Vermilion River and work its way upstream. He admitted that improvement of the coulee system should include the use of detention ponds; however, he opined that it made more sense to locate the ponds closer to where the coulee drained into the Vermilion River as that was where water along the coulee was being stored. Mr. Guidry testified that as part of the aforementioned improvements, all of the road crossings over the coulee would have to be upgraded to handle a 100-year storm.

22

*Location/Cost*

Mr. Trahan testified that when evaluating potential detention-pond sites, he considered several factors: whether it was undeveloped; its elevation; its proximity to the channel being detained, and its proximity to an area impacted by flooding. He stated that in order to avoid taking commercial or recreational values out of play, he considered undeveloped sites more favorably than developed sites. Mr. Trahan further stated that in order to reduce costs, he looked for property that was lower in elevation, as well as that which was closer to the channel being detained. He further stated that LCG tried to use property closer to the impacted area in order to provide a quicker flood response.

Mr. Trahan testified that although approximately ninety potential sites were identified throughout the parish, the only two sites considered specifically for the Lake Farm Road detention ponds was Lot 19 and that portion of Beaullieu Park containing the baseball fields. He stated that he chose Lot 19 over Beaullieu Park based on his consideration of the hydraulic studies, contour maps, and piping schematics required for both locations. Mr. Trahan testified that Lot 19 was significantly lower in elevation than Beaullieu Park, such that using Beaullieu Park would require the excavation of 40,000 more cubic yards of soil, at an additional cost of $400,000.00. He stated that it would also cost an additional $100,000.00 to tear down Beaullieu Park's infrastructure over the cost of clear-cutting Lot 19 and at least $5,000,000.00 to relocate its recreational facilities.[8]

Moreover, Mr. Trahan opined that Lot 19 was more ideally suited than Beaullieu Park for providing localized detention for Kings Haven and Ashland Park, as well as regional detention for Lateral 7. He explained that Beaullieu Park would

---

[8] Beaullieu Park consists of seven baseball fields, tennis courts, a dog park, a concession area, and parking.

23

require a longer run of pipe to connect to Kings Haven and Ashland Park, as well as Plantation Crossing Apartments, which was being connected to the larger detention pond. Mr. Trahan estimated that the cost for the additional pipe, including boxes and points of access, would run at least $150,000.00. He stated that although LCG initially may have considered using the eastern-most portion of Beaullieu Park,[9] it determined that it did "not provide the same level of use" as Lot 19 as there was no connectivity between it and Kings Haven and Ashland Park.

Mr. Trahan testified that in addition to requiring a longer run of pipe, the pipe connecting Beaullieu Park to the Kings Haven and Ashland Park subdivisions would have to cross Lateral 7, and the pipe connecting it to Plantation Crossing Apartments would have to cross Lateral 7C. He opined that this was problematic for two reasons. He explained that pipe laid so that it crossed the lateral above grade, or above the bottom of the lateral, would impede the flow of the lateral and "totally disrupt the hydraulic capacity" of the lateral. Mr. Trahan further testified that pipe run below grade, or underneath the lateral, would result in that portion of the pipe remaining wet. He explained that "[a] wet pipe is a term used to designate a pipe that's constantly either partially full or totally full[]" of water.

Mr. Trahan testified that LCG's development code prohibits drainage pipes from remaining wet after a storm. He explained that a wet pipe is problematic because of:

> Maintenance issues. The fact that [the pipe] lies at the very bottom of the pond, any silt or debris and everything would accumulate in the front of that pipe and disrupt the capacity of that. It would cause continued maintenance issues. The other thing is that even when the channel was – after the storm drained down, you're talking about seven-foot of water in the access point of that catch basin. So to provide maintenance to that system, you would always have seven-foot of water, if you would. And with regard to public works project and our

---

[9] Beaullieu Park's tennis courts and dog park are located to the east of its baseball fields and concession area.

24

maintenance forces having to maintain that system and the susceptibility of debris and silt accumulation affecting the capacity of that pipe, it would not be done in my division.

Mr. Trahan further could not recall ever designing a project which included a drainage pipe crossing a channel below grade. He explained that "storm drainage would normally discharge into the channel. So you would not be able to discharge that pipe into the channel if it was below grade of the channel."

Mr. Trahan testified that he never considered using Beaullieu Park for the dual purpose of detention ponds and baseball fields. He opined that "it was not a good idea to relocate the ball fields in a depressed area that would result from the detention ponds." He further stated that recontouring Beaullieu Park so that it was a bowl that contained baseball fields was not a viable option because soil left onsite for the baseball fields "could potentially displace areas that would hold water, you know, in various rainfall events." Mr. Trahan testified that "in my opinion, it would not be a best modern practice to place soil in areas that could be used for containment or detention of water." He stated that leaving soil onsite would also prevent LCG from reaching the detention ponds' required sizes and depths.

Mr. Ricks testified that based on logistics, Lot 19, as a low-lying area, was more suited for the excavation of a storage basin than Beaullieu Park. He explained that whether detention ponds on Beaullieu Park would provide the same effectiveness as those on Lot 19 depended on the ponds' volume and the length of pipe needed to connect the ponds to Kings Haven, Ashland Park, and Plantation Crossing Apartments. Mr. Ricks testified that because gravity causes water to flow more naturally to a lower-lying area, Lot 19 was the most logical location for the ponds. He further stated that pipe length can restrict the flow of water in the pipe.

Mr. Ricks testified that although the larger pond did not necessarily have to be located next to the smaller pond, the two ponds were connected by an overflow

25

connection. He further stated that the drainage project included rerouting Plantation Crossing Apartments' drainage system from Kings Haven to the panhandle of the larger pond. Mr. Ricks testified that although Plantation Crossing Apartments was properly detained when it was constructed, its drainage system discharged into Kings Haven. However, he stated that because Kings Haven's drainage system was built with a tailwater at the bottom of Lateral 7, it has a low flow rate, which causes water to pond in the streets of the subdivision. Mr. Ricks testified that this issue was exacerbated by the continuous drainage from Plantation Crossing Apartments, the volume of which was increased due to its impervious pavement. He stated that rerouting its drainage system to the larger pond would relieve the burden on Kings Haven. He stated that at its current proposed size, the smaller pond would not enough to handle the runoff from Plantation Crossing Apartments as well as Kings Haven and Ashland Park. He said that if it was decided to drain Plantation Crossing Apartment into the smaller pond, the pond would have to be enlarged.

Mr. Guidry testified that he did not believe that detention ponds located on either Lot 19 or Beaullieu Park would help reduce flooding in the Lake Farm Road area. However, using LCG's construction plans, he scaled the ponds to show that conceptually, they would fit on Beaullieu Park. He stated that he did this to show that an alternative route was available to LCG.

Mr. Guidry testified that his plans provided an example of how the drainage pipe from Kings Haven, Ashland Park, and Plantation Crossing Apartments could connect to the ponds by crossing underneath Lateral 7C. He admitted that the pipes located underneath the lateral would be wet and that LCG's development code does not allow wet pipes. However, he stated that it is difficult to maintain a dry system based on the elevation involved in some instances. Mr. Guidry further testified that he has received approvals in other parishes for wet systems, which entailed a small

26

amount of standing water in a pipe; though he admitted that these approvals occurred mainly in private development projects. He opined based on LCG's motivation, it might allow standing water in the drainage pipes crossing underneath Lateral 7C. He further claimed that whether LCG allowed wet pipes would be made on a case-by-case basis as he was aware of some projects in Lafayette that had wet systems.

Mr. Guidry estimated that it would take an additional 700 feet of pipe to connect Kings Haven, Ashland Park, and Plantation Apartments to the ponds if they were located on Beaullieu Park. He stated that at $110.00 per foot laid of forty-two-inch pipe, 700 feet of pipe would cost approximately $8,000.00. He further stated that it was possible that baseball fields located inside the ponds would have a playable surface. However, he stated that he did not consider placing ballfields in the ponds when he put his plans together. He further stated that the baseball diamonds would probably need to be turtle-backed or mounded.

*Safety*

Mr. Trahan testified that the cumulative effect of the four detention ponds along Lateral 7 would lower the water surface elevation at channel 6408.24 by sixteen inches in a 10-year storm, by slightly less than one foot in a 50-year storm, and by under a foot in a 100-year storm. He stated that the severing of Kings Haven and Ashland Park's drainage systems from Lateral 7 would have an impact on lowering the lateral's water surface elevation since the runoff from those subdivisions would be funneled into the smaller pond instead of the lateral.

Mr. Trahan further testified that connecting Kings Haven and Ashland Park to the smaller pond would reduce the water surface elevation in those subdivisions by more than one foot because the pond would have a lower beginning elevation than Lateral 7. He stated that houses in the subdivisions would not flood in 10, 25, or 50-year storms, and although water may back up in the streets due to inlet control,

27

it would eventually drain out such that there would be no water ponding in the streets in a 10-year storm. He said that the smaller pond's size and "the total volume that would fall in the encompassed area" would prevent the water in the subdivision from reaching the same level as the water surface elevation in Lateral 7. He stated that this would be an improvement on the drainage system currently in use.

Mr. Trahan testified that for every project he undertakes, he has to consider the effect that project will have downstream because LCG's design regulations and FEMA both prohibit a rise in water surface elevation. He explained that the no-rise requirement "affords a certain level of protection. Those water surfaces afford a certain protection to the homeowners, that when they build one-foot [sic] above the base flood elevation, they're afforded a certain level of protection. If that water rises in there, that – some part of that protection goes away." He further explained that in order to be included in FEMA's insurance program, its guidelines require there be no rise in the water surface elevation of a channel at any point along that channel.

Mr. Ricks testified that it made more sense to locate detention ponds in the Lake Farm Road area because that area has a larger flood zone. He stated that the four detention ponds along Lateral 7 will have the effect of reducing the water surface elevation by 10.8 inches in a 100-year storm and could result in a reduction of FEMA's flood line in that area by 200 feet if pursued by LCG. He further stated that any course LCG pursued which raised the water surface elevation downstream would be transferring a problem downstream. Mr. Ricks explained that this occurred in the 1980s when drainage channels were lined with concrete. He said that this had the effect of raising the water surface elevation of the Vermilion River.

Mr. Guidry testified that because the drainage systems in Kings Haven and Ashland Park were designed to handle a 2-year storm, they will be unable to convey the water from a 10 or 50-year storm to the smaller pond. Thus, he stated that water

28

from these storms will back up into the streets and then drain directly into Lateral 7. He further stated that the berms would prevent the runoff from the subdivisions from draining off, placing the homes located there under threat of flooding.

Based on the evidence presented, it is clear that LCG put a great deal of consideration into ways to reduce flood risks in Lafayette Parish subsequent to the August 2016 storms. It devised several programs for addressing storm water management, including a parish-wide detention program. The fact that it did not adopt formal plans for addressing this issue is not relevant. LCG is addressing the problem through the stated programs, and no one has referenced any law or ordinance requiring the adoption of such formal plans. Furthermore, Mr. Trahan and Mr. Guidry both testified that the use of detention ponds is a best modern practice for addressing flood issues along the Isaac Verot Coulee.

A review of LCG's official drainage map reveals that there are thirty-eight watershed areas in Lafayette Parish, one of which is the Isaac Verot Coulee. As stated previously, the coulee consists of its main channel as well as numerous lesser channels or laterals. Pursuant to the testimony provided by Mr. Trahan and Mr. Ricks, LCG's methodology for locating detention ponds was thorough and reasoned. It identified flood-prone areas in the parish, it identified sites in those areas where detention ponds might prove beneficial in reducing flooding, and it performed hydraulic studies to determine if those ponds would prove beneficial in reducing flooding during 10 and 50-year storms. In choosing detention pond locations, LCG further considered the location's elevation, its proximity to the channel being detained and the area highly impacted by flooding, and whether the property was developed or undeveloped. As Mr. Trahan explained, it costs less to excavate a detention pond on property that is lower in elevation as well as on property that is located closer to the channel being detained. He further stated that LCG prefers to

29

use non-developed property as opposed to developed property to avoid taking commercial or recreational values out of play and that it prefers to use a location closer to the area impacted by flooding because it provides a quicker response to flooding.

In order to alleviate flooding along Lateral 7, LCG determined that a series of four ponds would provide better flood relief based on hydraulic studies performed in other areas, which revealed that a series of ponds reduced flooding better than one large pond. Thus, LCG's decision to use the series of ponds was well reasoned, and the effect that the Lake Farm Road pond would have on the flooding along Lateral 7 cannot be considered solely on its own, but rather cumulatively with the other three ponds.

Due to the high propensity for flooding along Lateral 7, especially in the area of the Kings Haven and Ashland Park subdivisions, it is obvious why LCG chose to locate the Lake Farm Road detention ponds where Lateral 7 converged with Lateral 7C. Based on the introduced exhibits, it is further clear why LCG only considered Lot 19 and Beaullieu Park as the location for those specific detention ponds. Lot 19 and Beaullieu Park both abut Lateral 7C, with a Lot 19 located to west of the lateral, and Beaullieu Park located to the east of the lateral. Although Beaullieu Park abuts Lateral 7, Lot 19 abuts both Kings Haven and Plantation Crossing Apartments. According to Mr. Trahan, these factors made Lot 19 ideal for providing regional detention for Lateral 7, as well as localized detention for the Kings Haven and Ashland Park subdivisions and Plantation Crossing Apartments.

LCG chose Lot 19 over Beaullieu Park as the site for the detention ponds after considering the contour maps, hydraulic studies, and the piping schematics required for both locations. Based on a differential cost analysis, Mr. Trahan determined that LCG would have to spend an additional $650,000.00 in excavation, demolition, and

30

pipe costs to locate the detention ponds on Beaullieu Park over what it would cost to locate them on Lot 19. This did not include the approximately $5,000,000.00 he estimated it would cost to relocate the recreational facilities located on Beaullieu Park to another location. Mr. Guidry, other than estimating the cost of running additional pipe to Beaullieu Park, provided no further estimation of the costs associated with LCG's use of Beaullieu Park for the detention ponds.

Mr. Trahan's failure to prepare a written report documenting his analysis in no way proves that LCG failed to consider and weigh the relevant factors pertinent to the use of Beaullieu Park as an alternate location. In *Acadian Gas Pipeline System*, 77 So.3d at 464, the second circuit held that "testimony even without documentary evidence such as photos, field notes, costs estimates or interviews[,]" was sufficient to prove that the expropriating party considered the relevant criteria in determining the necessity of expropriating private property.

Mr. Guidry claimed that LCG could better reduce flooding along the Isaac Verot Coulee by improving the coulee's channels so that it could handle the flooding from a 100-year storm. However, as we stated previously, this is based on Mr. Guidry's own personal opinion as he has pointed to no statutory or industrial standards requiring LCG's drainage project be designed to such a capability. Furthermore, as pointed out by Mr. Trahan, both LCG and FEMA prohibit any improvement which would result in a rise in the water surface elevation of any channel. Mr. Trahan and Mr. Ricks pointed out that an improvement in the channel upstream would result in a rise in water surface elevation downstream.

Based on the foregoing, we find that LCG's action in choosing Lot 19 over Beaullieu Park was not one that was undertaken in haste or without considering and weighing all of the relevant factors. Consequently, we find that Defendant has failed to prove by clear and convincing evidence that LCG acted in bad faith or so

31

arbitrarily or capriciously that its action in selecting Lot 19 as the location for the two detention ponds "was without an adequate determining principle or was unreasoned." *Calcasieu-Cameron Hosp. Serv. Dist.*, 628 So.2d at 78-79. Accordingly, the order of expropriation previously rendered in favor of LCG is reinstated. We further remand this matter for further proceedings.

## DECREE

For the forgoing reasons, the judgment of the trial court in favor of Lucile B. Randol Heirs, LLC is reversed. The order of expropriation previously rendered in favor of Lafayette City-Parish Consolidated Government is reinstated, and this matter is remanded for further proceedings.

**REVERSED AND REMANDED.**